JACOB FALLO

versus

NEW ORLEANS RAILWAY & LIGHT CO.

Dinkelspiel; J.

This is a damage suit.

Plaintiff avers that on the 21st of March, 1922 at ten fifteen P. M., his automobile, in which he was riding, was run into and demolished at the corner of Broad and Onzago Streets, by a St. Bernard street car, No. 300, owned, operated and controled by the defendant company. Averring further that plaintiff was going down Board Street in his automobile and had stopped his automobile on the riverside of Board Street nearest to the curbing at the corner of Broad and Onzaga Streets, to permit a passenger to alight, and after the passenger had alighted, plaintiff looked to see if there was any street car coming in either direction, saw a street car coming down Broad Street a block and a half away coming downtown, and he turned his car to the left and proceeded to cross Broad Street, but so rapidly was the defendant's car travelling that before he could get over the crossing the car struck his automobile, demolishing same and injured him. That defendant's car was travelling at an excessive rate of speed in violation of law, particularly city Ordinance No. 786, Sec. 20, and that said street car was travelling at a rate of thirty five miles an hour and after the impact proceeded at least one hundred and fifty feet before it came to a stop. That the motorman made no effort to check or stop the car until he was right on top of petitioner, and so-terrible was the blow and impact that the automobile was thrown completely around and pushed all the way across the tracks, whilst the car continued on its way for a distance of one hundred and fifty feet before it came to a stop. Plaintiff avers that his car was damaged (describing the damages) in the sum of $150.00, and that he suffered severe and painful injuries, one of his right ribs was broken, his left arm severely bruised, strained and twisted, and he suffered a severe nervous shock from which he has not yet recovered, and

therefore should recover $1500.00 for his broken rib; $1000.00 for the injuries to his left arm and $1000.00 for the nervous shock he suffered.

He further averred that the defendant company was in the hands of the Receiver and that the Union Indemnity Company was surety for defendant company in the sum of $3650.00 and he cites and makes said company a partner to this suit, and claims judgment against both defendants for $3650.00, with legal interest from judicial demand, for costs and for general relief. Annexed to his petition is the bond of the Union Indemnity Company.

The defendant, the Railway Company answers substantially with a general denial, admits the furnishing of the bond in question and the amount thereof, and from information received admits that on the date as set forth in plaintiff's petition, plaintiff driving an automobile down Board Street reaching Onzaga Street turned directly in front of car No. 300, of the Board Street line, which was then about to cross over Onzaga Street; averring further that the driver of said automobile should have known that it was dangerous to go upon the track under the conditions then existing, and the accident and resulting damage was due to his careless, negligent and imprudent conduct in attempting to cross Broad Street when and as he did. Wherefore it prays for judgment in its favor.

The Union Indemnity Company virtually adopts the answer of the defendant, the railway company, and prays that the suit as against it be dismissed.

The ordinance in question was offered in evidence.

Mrs. E. Castaing testifies substantially that she lives at 2540 Onzaga Street and that she was a passenger in plaintiff's car the evening of the accident, had been out on a ride with him, she testifies that she was standing on the very corner where she had alighted from the car; the car had come from uptown and was going up Broad Street towards

downtown, the car stopped on Broad Street and Onzaga and it came
to a full stop, she got out at the curbing on the right hand
side, after she had alighted from the car plaintiff asked her
to look down the road, which she did and she reported that the
road was clear and that plaintiff could go ahead, plaintiff had
to cross Broad Street to the other side and when she saw the
street car it was a block distant and was going at a terrific
rate, so fast that you could not see it on the track, could
not even hear it; after striking plaintiff the car went fully
one hundred and fifty feet, there was no noise or warning given
by the car, she heard no bell ring, there was no one in the au-
to after she had left it except the plaintiff, after the street
car hit the automobile the automobile was between the uptown
track and the downstown track in the neutral ground.

On cross examination she testifies, "I was standing
right at the corner, more towards the uptown side, because he
never stopped his automobile at the very curbing but a little
further down, right by the tree; xkxxxxxxkx the automobile
when it stopped was it was about three feet from Onzaga Street,
the auto stood still, plaintiff cut off the power and and re-
mained at this place for five minutes. Witness further testi-
fies that plaintiff asked her to look and see if the road was
clear and she answered perfectly clear go ahead. Sher further
testifies she looked both ways, up and down, nothing was in
sight within a block away, it was about a quarter past ten at
night, the street lights were burning and burning very clear.
She testifies further that she continued to watch the street
car coming down and it came at such speed that she had hardly
time to look up when she saw the car had struck plaintiff, and
she was the first one to run to him.
Q. You say the back wheel must have been there, I did not ask
you what must have been, but what you saw. A. I am telling
you I was so bewildered I can't tell you just what happened

377

at the moment when he was struck. I don't know whether it was the front wheel on the truck or whether it was not. He was just about to cross when the car struck him.

Q. Then he had just gotten on the track when the car struck him? A. He must have been.

Q. You were looking at him? A. Yes.

The next witness was the plaintiff, who after stating that the auto in question was his property and where he had been that evening, and that he came from the direction of Canal Street and was turning the corner of Onzaga in order to let his passenger alight, he called to Mrs. Casteing after she had alighted from the car and asked her if everything was clear and she said yes, she was then standing in company with her son, witness looked himself and it looked to him as if the car was on the other side of the corner over a block off; he then testifies the car slowly speeded along and drove his car to go right across, he that peculiar effect you will hear **on** on a break, and saw no more, he was hit. He testifies there was no bell rang, that there was no noise only the screech of the brake, as if putting it on the second time; the car was in the middle of the block before it struck him, the car struck the middle of the auto.

Q. How much longer would it have been before you would have been cleark of the track?

A. I would imagine, I can't say what time it would be, but I figured I had lots of room, lots of time, lots of clearance. I can't imagine where the man came from. And the Ford is a quick pick-up car; it is not a drag, it goes right along.

He further testifies that he looked over his left shoulder and saw the car at least a block away before he started to cross, and in order to reach the rail, he was about five feet down near that curbing, towards the corner, the width of the street to the curbing is two or three feet from the car track and

he started to cross.

In describing his injuries he says that he could not get his breath, could not understand what that was, I said I wasn't hurt, and this lady said, You must be, because you can't talk. He called on Dr. McGuire a few days later and he made him go to the Charity Hospital to have an x-ray taken of the rib, and he worked on me for a broken rib; he suffered much pain, he also suffered from the injury of his arm, but the doctor told him that his arm was not broken. He testified that it cost him $150.00 to fix up his auto. On cross examination he was asked: Q. You turned on Broad street from there? A. I turned off---- Q. I mean before the accident, where had you turned on to Broad Street? A. I don't remember exactly. I was trying to think what house we went to. Ruxxmxxxxxxxxxxxxx

Q. You don't remember where you turned on Broad Street? A. No sir. Whether on Esplanade, or whether we came out Ursuline or Dumaine, I don't remember what way we turned in.

Q. When you got to the edge of the curbing, or in line with that curbing on the neutral ground, did you look again to see where the street car was, if it was coming? A. No.

Q. Why? A. When I did look the car was on the other side of the square, and I didn't think it could come that quick.

Q. And you didn't listen, to see if any car might be there-- whether it might have crept up on you? A. I didn't hear any noise coming, until in a second I heard like putting the kxxxkx brakes on in a tight pinch, on the second turn.

Q. Where was your automobile then? A. It struck me then. I don't know what happened then; I fell down in the car.

Q. There must have been some space of time from the time you heard this brake movement, or heard the noise from the putting on of the brakes, to the time you were hit. There must have been a fraction of time? A. That could have been the snapping of your fingers.

379

Q. You had time to sense that the car was on you, didn't you?

A. When I heard that peculiar noise.

Q. Your car had not been hit at that time? A. No, sir.

Q. Did you see the street car then? A. I heard the noise.
When I saw the car it had already hit me.

Q. When you saw the car, as you say a block away, did you know how it was moving? Was it moving fast, or slow?

A. I can't say that, because I didn't turn around to look at it any more. I ventured across.

Q. Why didn't you look just before you got on the track; why didn't you look again, to see if it was coming? A. I felt like I had good clearance. There was something radically wrong, that he caught me that quick.

Q. I am charging, in my answer, that there was something wrong with the operation of your automobile; that you didn't look before going on? A. Well, and I had her to tell me it was all right. I thought that was good assurance.

Joseph Castaing, the next witness, is the son of the lady who was a passenger in the car, and was waiting for his mother the night of March 21st, and was standing opposit the street car when it hit the automobile at the corner of Broad & Onzaga Streets; he testifies that the street car was fully a block and a half away before plaintiff started his auto, the car was coming towards St. Bernard Avenue, and he stated plaintiff started to go across, he heard plaintiff ask whether everything was clear before he started, he, the witness, answered go ahead Mr. Fallo, it is alright, and his mother said the same thing. Witness did not hear any warning, no bell rang, if there had been one he certainly would have heard it, he identifies the photo annexed to the record and offered in evidence, as the correct position of the auto.

The first witness in behalf of the defendant was a Mr. Pilie, he was sixty four years of age and employed as a collect-

or for different societies. On the night in question he was as a passenger on the street car.

He was asked:

Q. We are investigating an accident that occurred on the 21st of March, 1922, at Onzaga and Broad Streets, sometime about a quarter past ten in the evening, where a car on Broad Street and an automobile tried to cross the street at the same time and had an accident. Were you there at the time?
A. Yes, sir. I was on the third third seat of the car, of the street car. There was nobody in front of me to mask the view.

I was on the right side of the car, river side of Broad Street, the car was going in the direction downtown, towards St. Bernard. Witness testifies that the car that was hit tried to cross the street right in front of the street car.
Q. How far was the car away from Onzaga Street at the time the Ford started across? A. About ten or fifteen feet from the corner.

Witness further testifies that the street car was going possibly about ten or fifteen miles, that the gong was sounded on approaching Onzaga Street, he testifies that the motorman tried to put the brake on the car, couldn't do it, couldn't stop the car, but after the collission the car stopped about fifty feet from the other side of Onzaga Street.

Q. I am talking about after the accident, now, was the Ford on the left-hand side of the downtown track, or on the right-hand side of the down-bound track? A. On the left.
Q. It was on the space between the up and the down tracks?
A. Yes, sir.

Q. And the street car, the rear end of it, was about fifty feet from Onzaga? A. About.

This witness on his cross examination, did not in any manner alter or change his statements of his examination in chief, and on his reexamination by defendant's counsel:

Q. What I want to get particularly, if you can give it to me,

381

is this, when you saw this automobile turn as if to go across the street car tracks, how close was it to the street car track when the motorman rang his gong, how much space was there between the head of the automobile and the street car? A. About half a block before the crossing of Onzaga.

Q. I don't mean when he rang the bell the first time, there, but when the man started to turn to go across the street, did the motorman ring his gong again?

A. Yes sir.

Q. How much distance was there then from the automobile to the street car track, when he rang the bell again? A. About ten feet.

Q. I don't mean how far the street car was from that place, but how far was the automobile from the car-track? A. The automobile tried to pass before the car, when the car was at the corner, tried to cross to the other side of the street.

Q. Well, what I want is this: you said you heard the motorman sound his gong and he tried to stop the car. How close was the automobile to the car track at that time? A. He was on the car track, when the car came to the corner. He tried to cross the track. When the car reached the corner he was on the track.

Q. When you saw him did you see him in motion, the automobile? Did you see him moving? A. No.

Q. You didn't see the automobile moving? A. Oh, moving, yes, sir. Q. How close was he to the car track when you first saw him/moving towards the car track? A. A few feet about 4 or 5 feet.

The next witness was J. H. Damon, who has been connected with the street cars for about fourteen years, both in Algiers and New Orleans; witness testifies that he was the motorman of the street car on the 21st of March 1922.

Q. An accident occurred at Onzaga and Broad Streets, on March 21, 1922, about a quarter past ten, were you the motorman of a car which had such an accident? A. Yes.

382

Q. Do you remember how you were running, on approaching Onzaga street? A. Running on full speed. At the rate of eighteen miles an hour.

Q. Where was your street car when you first saw the automobile coming towards your track? A. When I first noticed the automobile, I was in the middle of the square before you get to Onzaga Street. The automobile was going in the same direction I was going, going down Broad street.

Q. And how close to Onzaga was the automobile? A. I noticed him about the middle of the block, first, I suppose. I was going down. He was going in the same direction. When I got about twenty feet from the crossing of Onzaga Street the automobile shot across in front of the car and hit the fender on the left hand side, catching his hind wheel, turning the car around this way, turned the head of his car uptown, on the left hand side of the track.

Q. Your car stopped after the accident? A. Yes, sir. I stopped in a distance of about 125 feet.

Q. When you saw him turn to go across your track how close to Onzaga Street were you? A. About twenty feet.

Q. What did you do? A. I sounded my gong and reversed my car right off; also used the brake.

Q. Could you stop the car any quicker than you did? A. No sir; impossible, at the speed I was going.

Q. How close was the automobile to the street car track when you sounded your gong? A. I noticed the automobile running in front of me. When I saw him, he took the sheer to cross the street towards the woods, and I struck my gong immediately and grabbed my brake. I had hold of the brake and checked my car right quick.

Q. You didn't get the question. I asked how far was the automobile from the street car track when you sounded your gong? A. I should judge he was about twenty some odd feet, at the most. That is how I noticed him to cross, that is why I sounded my gong.

The next witness in behalf of the defendant was Philip Lotruglio; this witness was a conductor for the street car company at the time of the accident and had been such for about five years;at the time of the accident he was on the rear end of the car, heard the crash, his car was stopped after the accident and he went out to find out what was the cause of it, the street car ran about twenty five or thirty feet, the automobile was on the neutral ground between the up and down tracks.

On cross examination:

Q. How fast was that street car going that night? A. Well the motorman had it on full speed, 9 points.

My idea is that this car could not go over eighteen miles an hour. Witness describes the jolt of the car when it hit the automobile, and that was the first he knew of the occurrence. He testifies on reexamination that a gong was sounded.

Q. Now Mr. Woodville asked you something about the motion of the car, if the crash was the first thing that you felt. I understood you to say something about yes, and at the same time the motorman put on the brake. How did you feel that, how did that come, the brake first and then the crash, or how? A. Felt the motorman jamming his brake, and then hitting just as he was doing that.

The other witness, Mr. Bloom, who was/asked a passenger in the car at the time of the accident, was al asleep and the crash awoke him, knows nothing of the cause of the accident in question.

The testimony of Mami, taken by consent outside of Court gives very little information one way or the other on the subject.

Considering the testimony pro and con, which is as usual in cases of this character, much at variance and at times contradictory, we are of the opinion, that the plaintiff in this case, whilst conversing with Mrs. Castaing after she had alighted from the car, drove his car on being informed by this witness, and possibly h r son that there was nothing

in sight and that the coast was clear, ne drove his auto in the same direction in which the street car was coming, and whether he did so prudently or not, it was his duty before attempting to cross the track to look and listen to determine whether that attempt should be made or not.  This he did not do until it was too late, and it has been frequently held by this Court and by the Supreme Court of this State; that one, before sax crossing the street car track must at his peril, look and listen, and if he fails in this he cannot recover damages for any injury which he may sustain.

The case of Stix Snider vs. N. O. & Carrollton Railway Co. 48 An. p. 1, is to this effect.

In the case of Heebe vs. N. O. & C. R. L. & P. Co. 110, La. 970, the Court held:

"The recognized rule is that, before attempting to cross a railroad track, a persons hould stop, look and listen, and it will hardly do to substitute for it a rule to the effect that, being at a distance from a crossing, towards which he and an electric or steam car are traveling, he may then form an opinion as to which of the two will get there first, and, acting upon that opinion, assay the crossing without giving himself further concern upon the subject."

The same doctrine is announced in Durbose vs. N. O. Ry. & Lt. Co. 123 La. 1029, and in MaShane vs. N. O. Ry. & Lt. Co., 137 La. p. 830 the Supreme Court says;

"One who attempts to drive a wagon across a street railway track in front of an approaching street car that could and should, with reasonable care be seen and heard approaching, is guilty of negligence, and is not entitled to damages for injuries received from a collission with the street car."

And in the 141st La. p. 1101, Tucker vs. I. C. R. R. the court held:

"No failure on the part of the railroad company to do its duty will excure anyone from using the senses of sight and

and hearing upon approaching a railway crossing; and whenever the due use of either sense would have enabled the injured person to escape the damage danger, the injury is conclusive evidence of negligence, without any reference to the railroad's failure to perform its duty."

Citing numerous authorities.

And in Leopold vs. T. & P. R. R. Co., 144 La. 1000, the court denied a recovery to plaintiff who was in an automobile driven by his son, and had almost crossed the track when it was struck; the Court held, that though the engineer failed to sound bell or whistle and did not see the automobile until it was struck, yet plaintiff could and should have seen the train before going upon the track, and not looking out for it was negligence, barring recovery.

The same doctrine was applied in Mohren vs. N. O. Ry. & L. Co. 147 La., 345, wherein the driver of a brewery wagon, injured in a collission with a street car at the corner of Chippewa and Fourth Streets, was denied recovery, the court holding:

"He either did not look up the street at the foot crossing, or, seeing the car coming at a swift rate, he miscalculated the distance, or the time in which it would take him to cross the track in safety. In thus acting he neglected to do his duty; and, though the motorman may also have been at fault, the injury must remain where it has fallen, as the fault of the plaintiff was the proximate cause of the injury to him."

From the foregoing authorities, and others, we are of the opinion, that plaintiff in attempting to cross the track as he did, whether he looked and saw the car coming at a rapid rate of speed or not, undoubtedly took the chance, and unfortunately was caught in the accident, which caused the injuries to himself and damage to his automobile, and for which the defendant cannot under the circumstances be held responsible.

For the reasons assigned, it is ordered, adjudged and decreed, that the judgment of the Court aquo be annulled, reversed and set aside, and that there now be judgment in favor of defendants, costs of both Courts to be paid by plaintiff.

-Judgment reversed and rendered-